J-S75043-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| J.H. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| J.Y.W. | : | |
| | : | |
| Appellant | : | No. 1362 WDA 2019 |

Appeal from the Order Entered August 7, 2019
In the Court of Common Pleas of Allegheny County Family Court at
No(s): FD-09-004150-004

BEFORE: STABILE, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    FILED FEBRUARY 4, 2020

J.Y.W. (Mother) appeals the order of the Allegheny County Court of

Common Pleas Family Court (trial court) entered on August 7, 2019, granting

J.H. (Father) primary physical custody of J.H. (Child) and permitting Father to

relocate with Child to Lawrence County. We affirm.

I.

The relevant facts and procedural history of this case are gleaned from

the summary in the trial court's 1925(a) opinion:

> Father and Mother are the parents of . . . [Child], who is 11 years
> old, having been born in February of 2008. Father and Mother
> were never married to each other. As the docket reflects, a little
> over a year after [Child] was born, the parties separated, and
> support and custody became the subject of litigation. On
> November 2, 2009, an Order of Court gave Mother and Father
> shared legal and physical custody, with Father having [Child]

_____

[*] Retired Senior Judge assigned to the Superior Court.

every weekend from Friday to Sunday. This arrangement essentially remained in effect until June 20, 2019, when by consent, Father's custody was expanded to every weekend from Thursday to Sunday.

[Child] has resided primarily with Mother, who is now married to B.J.W. ("Mother's Husband"). As of the hearing, Mother's three-bedroom household consisted of the following eight people: Mother, Mother's Husband, [Child] and four other children of ages four, five, eight, nine and ten (one by Mother from another paramour and four by her current husband).

Father subsequently married D.H. ("Father's Wife"), and, at the time of the hearing, the two lived together in the Brookline area of Pittsburgh. However, also at the time of the hearing, Father and Father's Wife had purchased a home on a large and more rural tract of land in Ellwood City in Lawrence County, which is served by the Laurel School District. The distance between the Mother's home and Father's new house is one hour and fourteen minutes by car. The previous driving time was anywhere from a half-hour to an hour, depending on traffic, and Father offered to provide all transportation from the Ellwood City home to Mother's home although he testified that he hopes Mother will share some of the effort.

In conjunction with this move and on the heels of conflict with Mother, Father filed for primary custody on January 4, 2019, and gave notice of his intent to relocate on January 14, 2019. Mother and Father have a history of conflict, with intermittent cooperation, but in the months preceding the filing, there was some escalation in their difficulties.

Father and Father's Wife called to Mother's house for Christmas to talk to [Child]. Testimony this Court found credible indicated that Mother got on the phone and said, "We are not having an f'n Christmas here because you don't want to pay for f'n classes or f'n child support." [Child] was privy to some or all of this because, at one point, Mother put [Child] on the phone and said, "Here is your f'n father," at which point [Child] was crying.

Afterward, Father's own mother made some negative comments on Facebook about the Christmas incident although Father and Father's Wife did not participate. Mother was disturbed by the use of Facebook to discuss family matters and then made the

unfortunate decision to read the negative posts to [Child], which predictably upset him.

The difficulties continued into the New Year.  During a New Year's dinner with Father and Father's Wife, [Child] appeared with bruises down his left arm.  He explained that Mother had instructed him to pour water onto the head of one of his stepsiblings while the girl was asleep, and that she had hit him with a plastic toy in response.  [Child] also told the couple about an incident with another child who visited Mother's home.  That boy had come over and repeatedly called [Child] "gay."  Mother successfully egged [Child] on to engage in a physical altercation with the boy.

Mother herself has engaged in similar verbal behavior and aims it at [Child].  [Child] enjoys activities like singing and dancing.  On one occasion, [Child] asked to have his hair cut in a particular fashion, and Mother told him no because he would look like a "faggot."  Mother also talked in front of [Child] about how [Child] would not be a good candidate for enrollment in football because he is "too much of a pussy."

Father's Wife is a nurse practitioner.  When Father described some of this conduct in a Court filing, Mother told Father that she intended to call the Board of Nursing to seek suspension of his wife's nursing license.  It seems that Mother's reasoning was that Father's Wife, as a nurse practitioner, is a mandatory child abuse reporter, and therefore Father's Wife should have her license suspended for not reporting Mother's abusive conduct.  Thus, it seems that Mother either regards her own conduct as abusive and faults Father's Wife for failing to report it, or Mother simply intended to harangue Father and Father's Wife for disapproving of her calling [Child] a "faggot" and a "pussy."

On one weekend in January, Father and Father's Wife drove to Mother's house to pick up [Child].  They waited for about 20 minutes, knocking on the door and honking but to no avail.  Ultimately, Mother answered them electronically, and [Child] came out crying and said he did not want to go although initially he would not say why.  Eventually, it came out that [Child] was upset about the Facebook incident from Father's side of the family and that Mother had gratuitously shared the content with the boy; Father clarified that he and his wife had stayed out of the Facebook postings, and [Child] then said he would come along.

Mother remained focused on the Facebook incident. The next day, Mother called to say there was a snowstorm although Father's Wife testified that the roads were clear by Father's home. Mother got on the phone with [Child] and began pressing [Child] on the question of whom he wanted to live with and brought up the Facebook episode.

The following weekend went no better. When Father and Father's Wife went to get [Child], Mother was angry about the Court proceedings that Father had initiated. She came to the car, with [Child] present at various times, and shouted that she "will f'n die before" letting Father's Wife raise her child because Father's Wife is "an f'n B word." Father's Wife testified that these types of incidents during phone calls with Mother also were not uncommon and that Father and Father's Wife spend considerable time calming [Child] during Father's custody periods.

Father described the atmosphere at Mother's home as chaotic and loud, testifying that, when he calls, there is always background noise that includes screaming and cursing and fighting. Father's observation is that [Child] appears anxious and overstimulated in his neighborhood and household with Mother.

Father and his Wife testified that Father wants [Child] to have an opportunity to live in Father's new home and area where [Child] will experience a more relaxed and peaceful environment. Father and his Wife hope to have space on their lands for family events, and they were in the process of furnishing a room for [Child]. They planned on building him a tree house that [Child] had requested and had begun purchasing play equipment like a soccer net. Father's Wife pointed out that they will live near Moraine State Park, which also has a lake, for recreation and that her own extended family is nearby, and that [Child] has a relationship with them. Father has discussed the move extensively with [Child]. Moreover, [Child] had visited the new residence.

Father's Wife will be closer to her work, and Father, who works as a carpenter, will be approximately the same distance from his job.

Father is not without his faults. Father has had weekend custody time for many years and has performed most parental duties although he has not been as involved in [Child's] medical appointments and school meetings as he could have been. This is significant because [Child] does have a medical condition which

causes his heart to flutter and change pace rapidly and must attend cardiology appointments. However, Father also testified that he is sometimes frustrated by Mother in the way Mother goes about scheduling appointments or school meetings on short notice, making it difficult for him to change his schedule. Mother emphasized an incident in which Father forgot to feed [Child] and called ahead to ask her to feed him when he got home. Father also did tell Mother that part of the reason for his requested custody change was her filing to resume support that they had temporarily suspended although this Court does not credit the idea that this is Father's primary motivation for seeking to move [Child] to his new home as Father was believable in testifying about the ways in which the change would benefit [Child].

Likewise, there have been times when Mother was more cooperative with Father and Father's Wife than set forth above. Father himself conceded that Mother loves [Child] and tries to involve [Child] in activities that he likes.

Father had personal troubles that would concern the Court except that the Court is persuaded that these difficulties are remote and that Father has overcome them. He stipulated that he was charged and sentenced to probation in 2011 for possession of a firearm while charges relating to possession of drug paraphernalia were dropped. Mother testified about Father's past issues such as her allegations that he drank, but she was unable to point to anything within recent years, with most of her testimony directed to the time when [Child] was an infant. Mother acknowledged that Father became more active as a parent as well after marrying Father's Wife. This Court finds that Father has demonstrated his fitness as a parent and will be capable of increasing his parental involvement in such matters as medical and school meetings when he is living with [Child]. This Court credited testimony that Father could have been more proactive in [Child's] medical and school progress but also credited the testimony that Mother, to a meaningful extent, has interfered with and foiled Father's participation.

There was great disagreement between Mother and Father about the better school district for [Child]. Mother defended the McKeesport school in which [Child] was enrolled at the time of the hearing. However, [Child] has not been in the McKeesport School system during his entire time as a student. In fact, for a time, he was enrolled in St. Angela Merici, where he started preschool.

Then, in second or third grade, Mother put him into the McKeesport School of Twin Rivers, partly for financial reasons.

In the McKeesport Twin Rivers public school, [Child] got bullied, and his grades began to suffer. Mother then pulled him out of Twin Rivers and enrolled [Child] in a cyber school. She then re-enrolled him at McKeesport. At the time of the hearing, [Child] was getting ready to enter sixth grade; hence, each of these changes occurred between preschool and fifth grade.

[Child] is in gifted programs, and Father explained that they have gifted programs as well at Laurel School District, but that he believed that the teacher-to-student ratio was better and would help [Child] and that [Child] should have the chance to participate in a school program where he can be less distracted by social difficulties. Father testified that news reports also list [Child's] home area with Mother as one of the most dangerous areas in the country. During that testimony, Mother and her counsel were silent, raising no objections. [Child] had told Father and Father's Wife about an incident in which he was riding his bicycle farther from Mother's home when a car pulled out right in front of him, causing him to swerve and fall over.

Father's Wife stated that her nephew goes to the Laurel School District and finds it relaxed and fun. She believed that the area and school compared favorably to McKeesport in terms of peacefulness and educational quality. Father researched the Laurel School and described how it had recently won an award and that it was highly rated in science, [Child's] favorite subject, and that it had numerous extracurricular activities to offer. There was testimony that [Child] will have friends regardless of which home he lives in.

[Child] testified that he loves both parents, and he expressed a desire to remain in his current home and school and to see his Father every other weekend. However, when [Child] was asked if his Mother is mean or calls him names, he replied: "Not that much." Overall, the Court found [Child] to be smart and pleasant but emotionally immature for his age; therefore, this Court could not give his preferences significant weight. Mother stressed [Child's] preferences in Court, but in recent writings to Father on the issue of where [Child] should live, Mother herself did write that [Child] is "an 11 year old boy. He can not make those decisions."

1925(a) Opinion, 10/7/2019, at 1-8 (citations omitted).

Following the custody trial held on August 7, 2019, the trial court entered a final order granting Father primary physical custody and permitting relocation, with Mother having shared legal custody on all matters except school choice. The trial court ordered that during the school year, Mother will receive custody of Child every second weekend, and during the summer, custody of Child will alternate each weekend.

Mother timely appealed the final custody order, contending that the trial court abused its discretion in several respects:

> 1. Whether the trial court erred and abused its discretion by awarding Father primary physical custody of [Child] by misapplying and/or ignoring the factors outlined in 23 Pa.C.S. § 5328;
>
> 2. Whether the trial court erred and abused its discretion by allowing Father to relocate with [Child] and/or whether it applied an incorrect standard in deciding that the relocation would provide a benefit to [Child];
>
> 3. Whether the trial court erred and abused its discretion in primarily basing its decision to allow Father to relocate with [Child] upon alleged danger in the McKeesport community where Mother resides;
>
> 4. Whether the trial court erred and abused its discretion in finding that Father's proposed move would not significantly impair Mother's ability to exercise her custodial rights;
>
> 5. Whether the trial court erred and abused its discretion by substantially reducing Mother's primary physical custody of [Child] to partial physical custody every other weekend, which is half that of Father's prior partial custody every single weekend; and

6. Whether the trial court erred and abused its discretion in failing to give weighted consideration to those factors which affect the safety of [Child], including but not limited to Father's criminal history, drug history and abuse history.

Id. at 8-9.

As to all grounds Mother asserts on appeal, an abuse of discretion standard applies:

> When we review a custody order, we accept the factual findings of the trial court that are supported by competent evidence of record and we defer to the trial court's weighing of the evidence. D.K. v. S.P.K., 102 A.3d 467, 478 (Pa. Super. 2014). However, we are not bound by the trial court's decision where it is "unreasonable in light of the sustainable findings of the trial court," and may reject the trial court's conclusions that involve an error of law or an abuse of discretion. Id. (quoting J.R.M. v. J.E.A., 33 A.3d 647, 650 (Pa. Super. 2011)). Our scope of review is plenary. Id.

S.S. v. K.F., 189 A.3d 1093, 1098 (Pa. Super. 2018).

For the reasons below, we find that none of Mother's appellate claims have merit.

## II.

### A.

Mother's first two grounds may be reduced to a single issue – whether the trial court misapplied the law that governs child custody and relocation. The factors for deciding custody are set forth in 23 Pa.C.S. § 5328(a).[1] The

_____

[1] The statute provides that the trial court must consider the following custody factors, giving weighted consideration to factors that affect a child's safety:

_____

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
(3) The parental duties performed by each party on behalf of the child.
(4) The need for stability and continuity in the child's education, family life and community life.
(5) The availability of extended family.
(6) The child's sibling relationships.
(7) The well-reasoned preference of the child, based on the child's maturity and judgment.
(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm
(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.
(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.
(11) The proximity of the residences of the parties.
(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.
(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.
(14) The history of drug or alcohol abuse of a party or member of a party's household.
(15) The mental and physical condition of a party or member of a party's household.
(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

factors for deciding relocation are set forth in 23 Pa.C.S. § 5337(h).[2]  When

both custody and relocation are at issue, a court must consider both sets of

factors and thereby determine how the child's best interests may be served.

See S.J.S. v. M.J.S., 76 A.3d 541, 550 (Pa. Super. 2013) (citing Collins v.

_____

[2] A trial court must consider the following relocation factors, giving weighted consideration to the factors that affect a child's safety:

> (1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.
> (2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.
> (3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.
> (4) The child's preference, taking into consideration the age and maturity of the child.
> (5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.
> (6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.
> (7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.
> (8) The reasons and motivation of each party for seeking or opposing the relocation.
> (9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.
> (10) Any other factor affecting the best interest of the child.

23 Pa.C.S § 5328(h).

Collins, 897 A.2d 466, 473 (Pa. Super. 2006)) (instructing courts to avoid "dissociating the issue of primary custody from the issue of relocation," and instead decide the issues together "under a single umbrella of best interests of the children.").

In this case, the trial court specifically referenced on the record the statutory factors guiding custody and relocation. The trial court also carefully evaluated the relevant statutory factors in light of the established facts. The trial court found that many factors balanced out evenly between Mother and Father. See Transcript of Custody Trial, 8/7/2019, at 279-87.

However, the trial court concluded that several custody factors weighed heavily in favor of Father, including:

- ) "[W]hich party is more likely to attend to the daily physical, emotional, developmental, education and special needs of the child." 23 Pa.C.S. § 5328(a)(1).

- ) "[W]hich party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs." 23 Pa.C.S. § 5328(a)(9).

- ) "[N]eed for stability and continuity in the child's education, family life and community life." 23 Pa.C.S. § 5328(a)(13).

Trial Court 1925(a) Opinion, at 9-10. As outlined in the trial court's opinion, each of those statutory custody factors overlap with the substantially similar factors set forth in the relocation statute. See 23 Pa.C.S. § 5337(h)(2)-(7).

In support of its conclusion, the trial court discussed the evidence adduced at the custody trial as well as the credibility of the parties. The trial court found that while Mother was not unfit to be a parent, she had "failed to

- 11 -

provide a consistently stable and nurturing environment for Child, who also has particular needs related to his intellectual gifts and his interests and emotional temperament." Id. at 10.

In its opinion and at the conclusion of the custody trial, the trial court also cited numerous examples of Mother's failings in this regard, as well as Child's sensitivity to the negative environment Mother provides. Id. at 10-11; see also Transcript of Custody Trial, 8/7/2019, at 279-87. Thus, it is clear that the trial court properly applied the law, notwithstanding Mother's disagreement as to how the trial court exercised its discretion in assessing the record facts.

B.

Mother asserts in her third appellate claim that the trial court abused its discretion by basing its decision on Father's testimony that Mother resides in an area with a high crime rate. This claim fails because the applicable custody and relocation statutes require the trial court to give "weighted consideration to factors that affect the safety of the child[.]" 23 Pa.C.S. § 5328(a); 23 Pa.C.S. § 5337(h).

In this case, Father's testimony about the high crime rate in Mother's neighborhood was unrefuted. Accordingly, the trial court did not go beyond its statutory mandate in crediting that testimony and expressing concern that the area could be detrimental to Child's physical well-being.

C.

Mother's fourth and fifth claims may be condensed into a single argument that the trial court erred in finding that the custody and relocation order would not significantly impair her ability to exercise her custodial rights. The applicable custody and relocation statutes required the trial court to determine whether its ruling would allow the parties to preserve their relationship with Child, and proximity to Child is a factor in that assessment. See 23 Pa.C.S. §§ 5328(a)(1), (8), (11); see also 23 Pa.C.S. § 5337(h)(3).

Here, the trial court did not abuse its discretion because it duly considered the ability of Mother to exercise her custodial rights. The trial court credited Father's promise to encourage and permit contact between Child and Mother. The trial court also noted the distance between Father's new residence and Mother's home. Additionally, there was ample evidence that relocation would benefit Child emotionally and academically.

In sum, the record reflects that the trial court considered all relevant evidence, in light of the pertinent statutory factors, to conclude that its order was in the best interests of Child. The trial court also relied on the evidence to determine that Mother retained an opportunity to maintain her relationship with Child. Thus, Mother has not established that the trial court abused its discretion in ruling that Mother's custodial rights would not be impaired.

D.

In her final claim, Mother argues that the trial court failed to afford due weight to Father's past criminality. However, the trial court did take note that Father had once been sentenced to probation for the unlawful possession of a firearm, as well as Father's past abuse of drugs and alcohol. The trial court determined that Father is now sober, and that the past behavior is too remote to pose any danger to Child. See Transcript of Custody Trial, 8/7/2019, at 282-83. This Court finds no basis in law or in fact to call into question the trial court's assessment of Father's credibility or the evidence in general. Thus, the trial court's order must stand.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/4/2020

- 14 -